UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| PATRICIA NILLS,<br><br>                    Plaintiff,<br><br>     vs.<br><br>ANDREW M. SAUL, COMMISSIONER<br>OF SOCIAL SECURITY,<br><br>                    Defendant. | 5:18-CV-05079-KES<br><br><br>MEMORANDUM OPINION AND<br>ORDER AFFIRMING THE DECISION<br>OF THE COMMISSIONER |

Plaintiff, Patricia Nills, seeks review of the decision of the Commissioner of the Social Security Administration denying her claim for disability insurance benefits (SSDI) under Title II of the Social Security Act, 42 U.S.C. § 423. Docket 17. The Commissioner opposes the motion and urges the court to affirm the denial of benefits. Docket 18. For the following reasons, the court affirms the decision of the Commissioner.

## PROCEDURAL HISTORY

Nills filed an application for SSDI benefits on June 16, 2014, alleging disability since March 30, 2012. AR 280-86. The Commissioner denied her claim initially on December 12, 2014, and upon reconsideration on April 10, 2015. AR 145, 151. Nills then appeared with counsel before Administrative Law Judge (ALJ) Lloyd E. Hartford on July 19, 2016. *See* AR 74-91 (transcript of hearing). ALJ Hartford issued a partially favorable opinion on August 25, 2016.

AR 120-34. On September 12, 2017, the Appeals Council remanded the August 2016 ALJ decision for additional consideration of Nills's ability to perform past relevant work and the transferability of Nills's skills to other means of employment. AR 141-44. On June 19, 2018, Nills then appeared with counsel before ALJ Michael A. Kilroy. *See* AR 35-73 (transcript of hearing). ALJ Kilroy issued an opinion affirming the denial of benefits on June 29, 2018. AR 7-21. The Appeals Council denied Nills's request for review on October 12, 2018. AR 1-6. Thus, Nills's appeal of the Commissioner's final decision is properly before the court under 42 U.S.C. § 405(g).

## FACTUAL BACKGROUND

Nills was born on October 26, 1949. AR 43, 92. Nills is not married, and at the time of the hearing, was living with her son. AR 78, 281. Nills has a high school diploma and has had on-the-job training as a certified nurse assistant (CNA) and medical technician. AR 66. Nills went to college for three years but never received a degree. AR 79. She has held several jobs including working as a custodian, CNA, medical technician, and office manager. AR 44, 46.

Nills has a history of several medical impairments including obesity, hypertension, hyperlipidemia, a left shoulder rotator cuff tear, degenerative joint disease of the right hip, and sacroiliitis. *See* AR 96, 933. Although Nills's hyperlipidemia and hypertension have not worsened, Nills has received extensive care for her left shoulder and right hip. *See* AR 478-1058.

On March 30, 2012, Nills fell while working as a custodian at Black Hills State University (BHSU). AR 510, 1097. The day of her fall, Nills presented to

2

Regional Health in Spearfish and stated her shoulder was a 10 out of 10 for pain. AR 510. Nills was prescribed medication and given various work limitations. AR 512. Nills's shoulder pain continued to worsen, and on April 10, 2012, an MRI showed a rotator cuff tear in her left shoulder. AR 507-10. Dr. Richard Little performed surgery on Nills's left shoulder on June 13, 2012, to repair her rotator cuff. AR 976-78. At the time of her injury, Nills was working both as a CNA at Dorsett Home and a custodian at BHSU. AR 52, 376. Nills did not return to work as a CNA after her injury, and worked on light duty at BHSU. AR 52-54. Nills returned to work part-time at BHSU as a custodian in October of 2012 following her surgery. *See* AR 54, 313-36.

After returning to work as a custodian, Nills began her shoulder rehab process. On October 11, 2012, Nills had a follow-up appointment with Dr. Little where she reported that there was a spot on her shoulder that was painful, but that each month her shoulder was improving. AR 489. On November 8, 2012, Nills had another follow-up appointment with Dr. Little where she reported that "her arm is doing great" and that her arm was just a little weak. AR 486. Nills also reported positive improvements and a decrease in her shoulder pain during her physical therapy sessions at Black Hills Physical Therapy. AR 519, 524, 529, 536.

Although Nills's pain at times improved, subsequent imaging showed a recurrent rotator cuff tear, which prompted a second surgery. AR 478, 672. Nills had the second surgery on her left shoulder performed by Dr. Clarke Duchene at Black Hills Orthopedic and Spine on June 11, 2013. AR 683-85.

Following this second surgery, Nills again continued with rehab and returned to work. AR 687-712. On October 21, 2013, Dr. Duchene found that Nills was making significant progress with motion and pain in her left shoulder. AR 667. Dr. Duchene assessed that Nills could actively forward flex her left shoulder 90 degrees and that Nills was grossly neurovascularly intact. *Id.* Nills reported that she still had some pain but reported good days as well. *Id.* On November 11, 2013, Nills was seen at Queen City Medical Center and reported she was "feeling well" but "still with arthritic pain." AR 590. Nills continued to improve during her rehab process, and on December 16, 2013, Dr. Duchene noted that Nills could forward flex 90 degrees and passively flex to 180 degrees with pain improving. AR 665. By January 20, 2014, Dr. Duchene believed he was "seeing progress" and that there was also "improvement in therapy." AR 663.

On May 15, 2014, Dr. Gary Childers, a provider at Regional Health, reported that Nills was "healthy-appearing," in "no acute distress," and was "ambulating normally." AR 589. A few months later, on September 22, 2014, Nills was seen at Orthopedic Institute for another evaluation of her left shoulder. AR 889. The exam showed that Nills's cervical spine range of motion was stiff but did not refer pain to the arm. *Id.* An x-ray showed Nills's joint spaces intact. *Id.* Dr. Keith Baumgarten at Orthopedic Institute was able to externally rotate Nills's arm to 30 degrees with a positive lag sign. *Id.* But an MRI showed attenuation of Nills's rotator cuff with a probable recurrent tear. *Id.* Although Orthopedic Institute called Nills on November 11, 2014, to follow-up and discuss options for her shoulder, Nills did not seek further treatment

for her left shoulder. AR 888. Nills also failed to reschedule physical therapy appointments and was discharged from Black Hills Physical Therapy's care on September 15, 2014. AR 686. Nills did not seek further follow-up treatment with her providers concerning her shoulder pain from June of 2015 until after her date of last insured. *See* AR 1041.

Apart from her left shoulder pain, Nills has also received care for hip-related pain. In 2012, x-ray results showed only a mild degenerative change of Nills's hips. AR 483. Nills, however, continued to experience pain in her hips. On January 28, 2014, Nills complained of hip pain at a visit with Dr. Christopher Dietrich. AR 648. Nills began a series of hip injections to treat her symptoms. *See, e.g.*, AR 645, 679, 681, 891. A CT scan was performed in April of 2014 and showed "moderate to severe right" femoroacetabular arthropathy and SI joint arthritis. AR 676. Nills continued with physical therapy and at a session on April 17, 2014, Nills reported that "she was nearly pain free." AR 691. Nills had another hip injection on October 9, 2014, at Spearfish Regional Surgery Center. AR 914. At a follow-up appointment on October 23, 2014, Nills stated that her pain was 0 out of 10 and that she was "very pleased with her current status." AR 912. Doctors noted that Nills did not have any significant pain or exacerbations, that she was able to ambulate and transition, and that her ability to go from sitting to standing improved. *Id.*

Although Nills continued to receive hip injections and reported significant improvement in pain, Nills symptoms continued. AR 636-85. An x-ray of Nills's right hip on November 12, 2014, showed bone-on-bone arthritis.

AR 890. Nills had her hip replaced on March 13, 2015. AR 941. A follow-up appointment on March 23, 2015, found that Nills had smooth internal and external rotation, was neurovascularly intact, and that her gait was very antalgic and shuffling. AR 1047. By April of 2015, Nills was "doing well" with a "full range of motion" in her hip. AR 1044. In May of 2015, Nills reported at her follow-up visit that she was "very satisfied" with the results of her procedure and that her hip felt good most days. AR 1043. Nills was released back to work with no restrictions for her right hip. *Id.* Nills did not seek further treatment for her hip until after her date of last insured. AR 1041-82. From September of 2013 to March of 2015, Nills worked part-time as a medication aide at Garden Hills Assisted Living. AR 57-58, 287-93.

## ADMINISTRATIVE HEARING

During the second administrative hearing, the ALJ heard testimony from Nills and a vocational expert. AR 37-73. Nills, represented by counsel at the hearing, testified about her education, work experience, and her hip and shoulder pain during the relevant time period. AR 43-67. Nills testified that her most recent jobs included work as a custodian, CNA, medical technician, and office manager. AR 44, 52-59. Prior to the alleged onset date, Nills testified that she had also previously held jobs as a CNA for Crook County Medical Services, an office manager at Wyoming Farm Bureau Federation, and an office manager for Mulligan Trailer Sales. AR 61-62, 65.

Nills testified that she worked as a custodian at BHSU when she was injured at work on March 30, 2012. AR 52. At the time, she was also working

as a CNA at Dorsett Home. *Id.* This job ended when she was injured. *Id.* Nills continued to work at BHSU after the injury until the first surgery on her left shoulder in June of 2012. AR 53. Nills did not work again at BHSU until October of 2012, when she returned back to light-duty work. *Id.* Nills worked as a custodian at BHSU until June of 2013, when Nills had a second shoulder surgery. AR 54. Nills then became a medical aide at Garden Hills in September of 2013. AR 56. Nills continued to work until her hip surgery in March of 2015. AR 57-58. Nills testified that she has not worked since her hip surgery. *Id.*

Nills also testified about the pain in her hip and shoulder. AR 59-63. Nills stated that she cannot lift with her left arm or lift her left arm above her shoulder. AR 59. Nills noted that her arm did get better for a while but that it has continued to "go downhill" since her second surgery. AR 60-61. Nills also testified that she cannot touch the top of her head with her left arm and that she has no grip in her left hand. AR 59.

Karen Black served as the vocational expert at the hearing. AR 64. The ALJ posed two hypotheticals. AR 67-69. For the first hypothetical, the ALJ asked whether an individual with similar past work history, age, and educational background as Nills, who could stand and walk for two hours, sit for six hours, with additional lifting and moving limitations, could perform any of Nills's past jobs. AR 67. The vocational expert stated that such an individual could work as an office manager. *Id.* The ALJ asked if there would be any other work using the first hypothetical with transferrable skills. AR 67-68. The

vocational expert testified that there would be sedentary jobs with little to no retraining such as a receptionist, billing clerk, and reservation clerk. AR 68.

For the second hypothetical, the individual was the same as the first but needed more breaks exceeding the two 15-minute breaks normally allowed during a shift and the 30 to 60-minute break normally allowed mid-shift, or if the individual missed more than four workdays in a typical work month. AR 68-69. The vocational expert testified that an individual who was missing more than two days per month or taking additional breaks daily as a consistent issue could not sustain full-time work in any occupation. AR 69. Nills's attorney asked what type of hand use or reaching requirements would be necessary for the job of an office manager, billing clerk, reservation clerk, and receptionist. AR 69-71. The vocational expert stated that handling, reaching, and fingering requirements were frequent for each occupation. AR 70-71.

## ALJ DECISION

Employing the five-step analysis associated with an application for social security benefits, the ALJ denied Nills's claim on June 29, 2018. AR 21. At step one, the ALJ found that Nills had not engaged in substantial gainful activity from her alleged onset date, March 30, 2012, through her date last insured, September 30, 2015. AR 13. At step two, the ALJ determined Nills had the following severe impairments: degenerative joint disease of the right hip, sacroiliitis, and left shoulder rotator cuff tear, status post-surgical repair. *Id.*

At step three, the ALJ concluded Nills did not have an impairment or combination of impairments that met or medically equaled the severity of one

of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 15.
At step four, the ALJ found Nills had the residual functional capacity (RFC) to
perform sedentary work with some limitations.[1] AR 15-19. At step five, the ALJ
found, through the date last insured, Nills was capable of performing past
relevant work as an office manager, as generally performed. AR 19-21. The ALJ
held that based on Nills's age, education, work experience, and RFC through
the date last insured, Nills was capable of making a successful adjustment to
other work that existed in significant numbers in the national economy, such
as a receptionist, billing clerk, or reservation clerk. AR 20. Thus, the ALJ
concluded that Nills was not disabled under the Social Security Act. AR 21.

## STANDARD OF REVIEW

The court must uphold the ALJ's decision if it is supported by
substantial evidence in the record as a whole. 42 U.S.C. § 405(g) ("The findings
of the Commissioner of Social Security as to any fact, if supported by
substantial evidence, shall be conclusive . . . ."); *see also Teague v. Astrue*, 638
F.3d 611, 614 (8th Cir. 2011). " 'Substantial evidence is less than a
preponderance, but is enough that a reasonable mind would find it adequate to
support the conclusion.' " *Teague*, 638 F.3d at 614 (quoting *Finch v. Astrue*,

---

[1] The ALJ found Nills could "lift and carry 10 pounds occasionally and less
than 10 pounds frequently; occasionally reach overhead with the left upper
extremity; lift up to one pound overhead with the left upper extremity; stand
and/or walk for two hours in an eight-hour workday; sit for six hours in an
eight-hour workday; occasionally climb ramps and stairs[.]" AR 15. The ALJ
also found that Nills could not climb ladders, ropes, or scaffolds; could
occasionally stoop, kneel, crouch and crawl; could frequently balance; and
needed to avoid concentrated exposure to workplace hazards. *Id.*

547 F.3d 933, 935 (8th Cir. 2008)). When reviewing the record, "the court 'must consider both evidence that supports and evidence that detracts from the Commissioner's decision.' " *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007)). If the Commissioner's decision is supported by substantial evidence in the record as a whole, the court may not reverse it merely because substantial evidence also exists in the record that would support a contrary position or because the court would have determined the case differently. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).

The court also reviews the Commissioner's decision to determine if an error of law has been committed, which may be a procedural error, the use of an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Issues of law are reviewed de novo with deference accorded to the Commissioner's construction of the Social Security Act. *Id.* (citing *Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008)).

**THE FIVE STEP PROCEDURE FOR DISABILITY DETERMINATIONS**

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(3)(A). "An individual shall be

10

determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A). An ALJ must apply a five-step procedure when determining if an applicant is disabled. *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993). The steps are as follows:

**Step One**: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b); 20 C.F.R. § 416.920(b).

**Step Two**: Determine whether the applicant has an impairment or a combination of impairments that are severe. 20 C.F.R. § 404.1520(c); 20 C.F.R. § 416.920(c).

**Step Three**: Determine whether any of the severe impairments identified in Step Two match the listing in Appendix 1. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 416.920(d).

**Step Four**: Considering the applicant's RFC, determine whether the applicant can perform any past relevant work. 20 C.F.R. § 404.1520(f); 20 C.F.R. § 416.920(f).

**Step Five**: Determine whether any substantial gainful activity exists in the national economy that the applicant can perform. 20 C.F.R. § 404.1520(g); 20 C.F.R. § 416.920(g).

**DISCUSSION**

Nills urges the court to review the ALJ's decision for two reasons. First, Nills argues that the Commissioner violated the "*Chenery* Doctrine" and defended the ALJ's decision on grounds not articulated by the ALJ. Docket 17 at 16. Second, Nills argues that the ALJ failed to provide "good reasons" for rejecting Nills's credibility. *Id.* at 15.

## I. The *Chenery* Doctrine

As an initial matter, while arguing that the ALJ failed to provide good reasons for his credibility determination, Nills argues that the Commissioner cannot defend an ALJ's decisions on grounds that the agency itself did not embrace. *See id.* at 16 (citing *SEC v. Chenery Corp.,* 318 U.S. 80, 87-88 (1943)). Known as the *Chenery* doctrine, Nills argues that the Commissioner cannot generate a new basis for the ALJ's conclusion. *Id.* at 16-25. The Commissioner argues that there was no *Chenery* violation because the ALJ supported his conclusion with evidentiary details found in the record, and the Commissioner simply reinforced the ALJ's credibility determination by providing additional evidentiary detail consistent with the ALJ's stated rationale. Docket 18 at 5-6. The Commissioner argues that this type of support is not advancing a new, different rationale or theory, which was the Supreme Court's concern in *Chenery*, but instead is the agency arguing that the ALJ's decision is supported by substantial evidence in the record as a whole. *Id.* at 6.

Nills's citation to the *Chenery* doctrine is misplaced. The Supreme Court in *Chenery* held that when a court is reviewing an agency decision, the

reviewing court is limited to examining agency action on "the grounds upon which the Commission itself based its action[.]" 318 U.S. at 88. The Eighth Circuit has interpreted *Chenery* to stand for the premise that " 'a reviewing court may not uphold an agency decision based on reasons not articulated by the agency,' when 'the agency [has] fail[ed] to make a necessary determination of fact or policy' upon which the court's alternative basis is premised." *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001) (quoting *HealthEast Bethesda Lutheran Hosp. & Rehab. Ctr. v. Shalala*, 164 F.3d 415, 418 (8th Cir. 1998)); *see also Michigan v. EPA*, 135 S. Ct. 2699, 2710 (2015) (stating that it is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency involved when it took the action."). Thus, *Chenery* demands that an ALJ providing reasoning behind his determination of fact or policy so that a reviewing court can perform the requisite judicial review.

It is unclear what Nills believes to be the *Chenery* violation. Nills appears to argue that the Commissioner committed a *Chenery* violation by pointing out evidentiary details found in the record as a whole but not in the ALJ's decision. *See* Docket 17 at 16. But the responsive brief of the Commissioner does not require this court to consider new findings that were not articulated in the ALJ's decision. *Chenery* applies when the agency "fails to make a necessary determination of fact or policy." *HealthEast*, 164 F.3d at 418. Here, the ALJ made an express credibility determination and clearly set forth his reasoning in his decision. *See* AR 10-21; *Chenery*, 318 U.S. at 94 (stating that "the grounds

upon which the administrative agency acted [must be] clearly disclosed[.]"); *see also Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004). This evidence was then cited by the Commissioner in the agency's responsive brief. The Commissioner has not engaged in post hoc rationalization and presented the court with a new finding of fact or policy. Thus, there appears to be no *Chenery* violation.

Nills also appears to argue that ALJ Kilroy committed a *Chenery* violation by considering the record as a whole and reaching a different result than the first ALJ on remand. *See* Docket 17 at 16. The fact that the first ALJ's decision was remanded by the Appeals Council does not mean that ALJ Kilroy is precluded from reviewing the administrative record as a whole and pursuing a new rationale and new decision for the agency. *See Mayo v. Schlitgen*, 921 F.2d 177, 179 (8th Cir. 1990) (finding that a district court may remand "for the agency to consider whether to pursue a new rationale for its decision or perhaps to change its decision."). Thus, ALJ Kilroy has not violated *Chenery* by stating the grounds upon which he came to his credibility determination and ultimate decision in Nills's case.

Finally, it is this court's duty to examine the entirety of the administrative record to determine if there is substantial evidence to support the ALJ's decision. As discussed above, the court will "affirm the Commissioner's decision if supported by substantial evidence on the record *as a whole.*" *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (emphasis

added). When reviewing the record as a whole, remand is not warranted where a deficiency in opinion-writing has no effect on the outcome of the case:

> Generally, an ALJ's failure to adequately explain his factual findings is not a sufficient reason for setting aside an administrative finding. Remand is warranted where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit this Court to conclude that substantial evidence supports the Commissioner's decision.

*Vance v. Berryhill*, 860 F.3d 1114, 1118 (8th Cir. 2017) (internal quotations and citations omitted). The Eighth Circuit has "consistently held that" deficient ALJ opinion-writing is not a sufficient reason to set aside an administrative finding when the writing deficiency had no effect on the decision if the record as a whole supports the administrative conclusion. *Id.* (citing *Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999)). Thus, because this court will review the ALJ's credibility determinations considered in light of the administrative record as a whole, there is no *Chenery* violation.

## II.     Rejection of Nills's Credibility

Before considering step four, the ALJ must determine the claimant's RFC, which is the most the claimant can do despite the claimant's mental and physical limitations. *Brown v. Barnhart*, 390 F.3d 535, 538-39 (8th Cir. 2004) (citing 20 C.F.R. § 404.1545(a)(1)). "The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant[.]" *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). The claimant's RFC is determined based on all relevant evidence in the record, including medical records, observations of treating physicians, and the individual's own description of his

or her limitations. *See Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006). But the ALJ's findings "must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (citation omitted). The ALJ's RFC evaluation must include a "narrative discussion" that cites specific medical and non-medical evidence and explains how the evidence supports his conclusions. SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). Also, the ALJ must explain how any material inconsistencies or ambiguities in the record were considered and resolved. *Id.*

The ALJ determined Nills had the RFC to do sedentary work with some limitations. AR 15-19; *see supra* note 1. In determining Nills's RFC, the ALJ considered Nills's symptoms and whether they were consistent with the objective medical evidence, as well as the opinion evidence of several physicians and state agency medical assessments. AR 17-21. Nills argues that the ALJ did not provide good reasons for rejecting her credibility and should have issued a more restrictive RFC assessment that incorporated Nills's subjective complaints of pain in her shoulder and hip. Docket 17 at 16-25.

A claimant's statements about her symptoms, previously referred to as "credibility," are evaluated by the ALJ to determine the claimant's RFC. *See* SSR 16-3p, 2016 WL 1119029, at *11 (Mar. 26, 2016) ("An individual's residual functional capacity is the most the individual can still do despite his or her impairment-related limitations. We consider the individual's symptoms when determining his or her residual functional capacity and the extent to which the

individual's impairment-related symptoms are consistent with the evidence in the record."). The ALJ does not evaluate a claimant's statements about the intensity, persistence, and effect of her symptoms in isolation at this step. *See Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (noting that the ALJ engages in a factor analysis when evaluating a claimant's credibility). The ALJ must also determine if the objective medical evidence in the record supports the severity of a claimant's alleged symptoms. *See Crawford v. Colvin*, 809 F.3d 404, 410 (8th Cir. 2015) ("[A]n ALJ may disbelieve a claimant's subjective reports of pain because of inherent inconsistencies or other circumstances." (internal quotation omitted)). "Symptoms such as pain are considered along with any impairments when determining a claimant's RFC." *Brown*, 390 F.3d at 541.

In determining whether to fully credit a claimant's subjective complaints such as pain, the ALJ engages in a two-step process: (1) is there an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms; and (2) if so, the ALJ evaluates the claimant's description of the intensity and persistence of those symptoms to determine the extent to which the symptoms limit the claimant's ability to work. *See* SSR 16-3p, 2016 WL 1020935, at *1467-68 (Mar. 16, 2016); 20 C.F.R. § 404.1529. In evaluating the second step of the analysis, an ALJ must consider several factors including: "(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating

factors; and (5) functional restrictions." *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010) (internal quotation omitted). The ALJ may also consider the claimant's relevant work history and the lack of objective medical evidence to support the claimant's complaints. *See id.* (factors referred to as "*Polaski* factors" from *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). "While there is no doubt the claimant experiences pain, the important question is how severe the pain is." *Brown*, 390 F.3d at 541.

A credibility determination on a claimant's subjective testimony is primarily for the ALJ to decide. *See Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010). This is because the ALJ is in a better position to evaluate credibility of witnesses. *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). The court will "defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (internal quotation omitted). The ALJ does not need to explicitly discuss each of the factors above. *Wildman*, 596 F.3d at 968 (citing *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005)); *see also Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) (finding that if the ALJ explicitly states good reasons for discrediting the witness and it is adequately supported by substantial evidence, the court should defer to the ALJ's credibility determination).

At step one, the ALJ found that Nills had a history of degenerative joint disease of the right hip, sacroiliitis, and a left shoulder rotator cuff tear that were genuine and could reasonably be expected to produce her symptoms. AR

13, 16-17. But at the second step, the ALJ found some of Nills's descriptions as to "the intensity, persistence, and limiting effects of those symptoms" were "not wholly consistent" with the evidence in the record. AR 17. Nills argues that the ALJ failed to provide "good reason" for rejecting her statements concerning the intensity, persistence, and limiting effects of her symptoms. Docket 17 at 16-25.

First, Nills argues that her failure to receive treatment for her shoulder "from June 2015 until May 2016 is not a 'good reason' to reject the Claimant's subjective complaints of pain during the period from March 2012 until October 2014." *Id.* at 18. One factor the ALJ can consider is the duration, frequency, and intensity of a claimant's conditions. *Brown*, 390 F.3d at 541. The ALJ addressed Nills's lack of follow-up treatment not to discredit her pain from 2012 to 2014, but to discredit the intensity and persistence of Nills's symptoms up to the date of last insured. *See* AR 17. The ALJ considered the frequency and extent of Nills's treatment as a whole during the time frame in question compared to the degree of Nills's subjective complaints in arriving at his RFC determination. *See id.* Because Nills did not undergo a revision rotator cuff repair and did not receive follow-up treatment up to her date of last insured, the ALJ found that the alleged intensity and persistence of Nills's symptoms were inconsistent with the overall evidence of the record in accordance with SSR 16-3p, 2016 WL 1020935. *See id.* Thus, the ALJ properly considered Nills's failure to receive shoulder treatment up to her date of last insured as a good reason to discredit Nills's complaints.

Next, Nills argues that various treatment notes cited by the ALJ are not good reasons to reject Nills's credibility. Docket 17 at 18-22. Objective medical evidence—beginning in March 2012—was cited by the ALJ as not wholly consistent with Nills's subject complaints regarding her pain, weakness, and limited function of her left shoulder. *See* AR 17 (citing AR 512, 593, 602, 603, 606, 637, 643, 673, 731, 894, 904, 912, 920, 936, 971, 1313). The ALJ did not disregard Nills's complaints in their entirety, finding that the objective evidence "illustrate[d] that the claimant's symptoms were genuine[.]" *Id.* Instead, the ALJ determined that although her left shoulder symptoms were genuine, relevant treatment records, examination findings, and objective diagnostic testing results showed intact motor and neurological functioning, making the records not wholly consistent with Nills's statements about her pain and limited functions. *Id.* This is another *Polaski* factor that an ALJ may consider in assessing Nills's complaint, for although " '[a]n ALJ may not disregard a claimant's subjective pain allegations solely because they are not fully supported by the objective medical evidence,' subjective complaints about pain 'may be discounted if there are inconsistencies in the evidence as a whole.' " *Brown*, 390 F.3d at 541 (quoting *Chamberlain v. Shalala*, 47 F.3d 1489, 1494 (8th Cir. 1995)). Thus, the ALJ properly considered the inconsistent results as a good reason to discredit Nills's complaints.

Another factor considered by the ALJ was inconsistences between Nills's allegations of persistent symptoms and limited mobility compared with her daily activities and relevant work history. AR 17-18. "[I]nconsistencies between

subjective complaints of pain and daily living patterns may . . . diminish credibility." *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007) (alterations in original) (internal quotations omitted). In assessing a claimant's daily activities, "the ALJ must consider the 'quality of the daily activities and the ability to sustain activities, interest, and relate to others over a period of time and the frequency, appropriateness, and independence of the activities.' " *Hendrickson v. Berryhill*, No. 4:17-CV-04173-VLD, 2018 WL 5984837, at *28 (D.S.D. Nov. 14, 2018) (quoting *Wagner v. Astrue*, 499 F.3d 842, 852 (8th Cir. 2007)). "Evidence of daily activities that are inconsistent with allegations . . . may be considered in judging the credibility of such complaints." *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016) (citing *Dunahoo v. Apfel*, 241 F.3d 1033, 1038-39 (8th Cir. 2001)).

Here, the ALJ considered that Nills reported that she was able to walk 3 miles a day and climb over 10 steps at a time. AR 18. The ALJ also considered that Nills reported she was able to care for pets, handle her personal care and hygiene, do laundry, cook, wash dishes, clean, drive, and shop in stores two to three times a week. AR 16. The ALJ also noted that Nills was working at the time of the hearing and had worked with few break periods since 2012. *Id.* Because her daily activities were inconsistent with her complaints of limited mobility and significant pain, the ALJ found that Nills's symptoms were not entirely supported. The Eighth Circuit has found such daily activities to discredit a claimant's subjective complaints. *See, e.g., Ponder v. Colvin*, 770 F.3d 1190, 1195-96 (8th Cir. 2014) (holding the claimant's ability to perform

light housework, wash dishes, handle money, leave her house, shop for groceries, watch TV, attend church, and visit family undermined her assertion of total disability); *Baker v. Barnhart*, 457 F.3d 882, 893 (8th Cir. 2006) (holding there was substantial evidence to support the ALJ's finding that the claimant performed a significant number of daily living activities and that he was capable of self-care because he drove, shopped, and ran errands); *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (finding that working for years with the same alleged symptoms undermines a claimaint's credibility); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) (noting that "[o]ther relevant factors include the claimant's relevant work history"). Thus, the ALJ properly considered Nills's daily activities as a good reason to discredit Nills's complaints.

Similar to the ALJ's assessment regarding Nills's lack of additional treatment for her left shoulder, the ALJ also discredited Nills's subjective complaints because Nills "did not seek further orthopedic treatment for her hip until well after her date of last insured[.]" AR 18; *see also Reece*, 834 F.3d at 909 (holding a lack of complaints to a treating physician detracts from a claimant's allegations of a disabling impairment). The ALJ also noted that the post-operative treatment records through the date of last insured demonstrated a successful hip surgery recovery, and that there was a lack of objective imaging of Nills's hip that would suggest any worsening conditions of Nills's hip. AR 18. This is an additional factor the ALJ may consider in assessing Nills's complaints. *See Brown*, 390 F.3d at 541 (consider the "absence of

objective medical evidence to support the complaints."). Thus, the ALJ properly considered Nills's lack of hip treatment following her hip surgery as a good reason to discredit Nills's complaints.

Finally, Nills argues that the ALJ rejected her credibility regarding her inability to reach on more than a frequent basis and for six hours per day. Docket 17 at 25. The ALJ did not directly discredit Nills's reaching symptoms in his opinion, but for the reasons stated above, found that her complaints of limited function were not wholly consistent with the evidence in the record and her daily activities. *See* AR 16-18. The ALJ did, however, discuss Nills's reaching abilities expressly when considering state agency medical assessments and an independent medical examination. The ALJ gave significant weight to state agency medical consultant opinions as to Nills's range of sedentary work. AR 18. An ALJ "may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009) (quoting *Prosch v. Apfel*, 201 F.3d 101, 1014 (8th Cir. 2000)). The ALJ concluded that the limitations identified by the state medical consultants were consistent with the record as a whole. AR 18. Thus, the ALJ properly considered Nills's alleged reaching limitations in arriving at her RFC.

Because "the ALJ [was] in a better position to evaluate" Nills's credibility, the court will "defer to [his] determinations as they are supported by sufficient reasons and substantial evidence on the record as a whole." *Andrews v. Colvin*, 791 F.3d 923, 929 (8th Cir. 2015). Here, the ALJ explained why he did not find

Nills's statements "entirely consistent with the medical evidence and other evidence in the record[.]" AR 16. Although the ALJ did not expressly cite to *Polaski*, the ALJ conducted an analysis under 20 C.F.R. § 404.1529 and considered factors such as Nills's daily activities, the duration and frequency of Nills's pain, Nills's relevant work history, and inconsistencies in the record. *See* AR 16-19. By doing so, the ALJ determined Nills's RFC and provided "good reasons" to discredit Nills's subjective complaints. Thus, the court finds the ALJ did not err in his credibility determination.

## CONCLUSION

The court finds that the ALJ's finding was supported by substantial evidence in the record as a whole. Thus,

IT IS ORDERED that the decision of the Commissioner is AFFIRMED.

Dated November 15, 2019.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE